**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| EVEREST INDEMNITY INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>ALL RISKS, LTD.,<br><br>Defendant. | Civil Action No. 16-03582 (GC) (TJB)<br><br>**OPINION** |
| ALL RISKS, LTD.,<br><br>Third-Party Plaintiff,<br><br>v.<br><br>SUMMIT GLOBAL PARTNERS OF TEXAS, INC., and USI SOUTHWEST, INC.,<br><br>Third-Party Defendants. | |

**CASTNER, U.S.D.J.**

**THIS MATTER** comes before the Court upon Third-Party Defendants USI Southwest, Inc., and Summit Global Partners of Texas, Inc.'s (together, "USI") Second Motion for Summary Judgment. (ECF No. 163.) Third-Party Plaintiff All Risks, Ltd. ("All Risks") opposed, and USI replied. (ECF Nos. 166 & 169.) The Court held oral argument on May 21, 2024. (ECF No. 173.) After careful consideration of the parties' submissions and arguments, and for the reasons set forth below, and other good cause shown, USI's motion is **GRANTED** in part and **DENIED** in part.

I.    **BACKGROUND**

A. PROCEDURAL BACKGROUND

The claims remaining in this case concern the relationship between two commercial insurance intermediaries, that is, the relationship between an insurance broker for an insured and an insurance agent for an insurance company.

Everest Indemnity Insurance Company, a Delaware corporation, initiated this lawsuit against All Risks, a Maryland corporation and wholesale insurance agent.[1]  (ECF No. 1 ¶¶ 4-5.) Everest alleged that All Risks had provided quotes to Monitronics International Inc., a large alarm monitoring company, for new Everest commercial general liability and excess insurance policies. (*Id.* ¶¶ 21-26.)  During negotiations in August 2012, All Risks agreed to remove from the Everest policies a provision that disclaimed coverage for claims arising under the Telephone Consumer Protection Act ("TCPA").  (*Id.* ¶¶ 23-24.)  All Risks allegedly did so without obtaining the necessary permissions from Everest.  (*Id.* ¶¶ 10, 23-24.)

After the policy was bound and issued, Monitronics began submitting insurance claims to Everest seeking defense and indemnity for multiple class action lawsuits that asserted TCPA violations against Monitronics.  (*Id.* ¶ 27.)  Because the TCPA exclusion had been removed from the Everest insurance policy by All Risks, Everest was forced to defend at least fourteen different TCPA suits against Monitronics.  (*Id.*)  When Everest tried to amend the policy in March 2013 to add the TCPA exclusion, Monitronics sued to invalidate the amendment.  (*Id.* ¶¶ 28-29.)

---

[1]     The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a).

On June 20, 2016, Everest sued All Risks for negligence, breach of contract, breach of fiduciary duty, and for declaratory judgment.  (*Id.* ¶¶ 33-55.)  Everest's claims were eventually settled and an order of dismissal issued in August 2020.[2]  (ECF No. 125.)

The claims left in the case are third-party claims All Risks asserts against USI.  (ECF No. 126.)  USI is the retail insurance broker that placed the liability and umbrella insurance for its client Monitronics.  (*Id.* ¶ 1.)  All Risks alleges that it only agreed to remove the TCPA exclusion from the Everest insurance policies "based on USI's representations that indicated Monitronics had no exposure to TCPA claims."  (*Id.* ¶ 4.)  All Risks further alleges that USI "grossly misrepresented the true nature of Monitronics exposure to TCPA claims in order to induce All Risks to issue policies without a [TCPA] exclusion, thus forcing Everest to cover the TCPA claims."  (*Id.* ¶ 7.)  All Risks' claims against USI were for breach of contract, breach of warranty, breach of implied duty of good faith and fair dealing, fraud, negligent misrepresentation, declaratory judgment, and common-law indemnity.  (*Id.* ¶¶ 40-81.)

In November 2022, USI moved for summary judgment.  (ECF No. 145.)  In June 2023, the Court granted the motion in part.  (ECF No. 161.)  Specifically, the Court granted judgment in USI's favor on Counts One (Breach of Contract), Two (Breach of Warranty), Three (Breach of Implied Duty of Good Faith and Fair Dealing), and Six (Declaratory Judgment).  (*Id.* at 8-13.[3])  The Court found that "the allegations against USI sound only in tort, *i.e.*, the violation of non-contractual duties."  (*Id.* at 13.)  The Court reserved judgment on Counts Four (Fraud in the Inducement), Five (Negligent Misrepresentation), and Seven (Common-Law Indemnity), "because the parties disagree[d] about what law should be applied, and consequently, brief[ed] . . .

---

[2]      All Risks also settled third-party claims it asserted against Monitronics.  (ECF No. 125.)

[3]      Page numbers for record cites (*i.e.*, "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

[the] claims under the laws of different states." (*Id.* at 8-9.)  In conducting a preliminary conflict-of-law analysis, the Court reserved on whether Maryland or New Jersey law applies to the negligent misrepresentation claim, found that New Jersey law applies to the fraudulent inducement claim, and found that Maryland law applies to the common-law indemnity claim.  (*Id.* at 13-19.)

On July 28, 2023, USI filed its second motion seeking summary judgment on the three remaining claims.  (ECF No. 163.)  All Risks opposed, and USI replied.  (ECF Nos. 166 & 169.)  Oral argument was held on May 21, 2024.  (ECF No. 173.)

## B. Factual Background[4]

All Risks and Everest, through Everest's underwriting manager Mt. McKinley Managers, LLC, were parties to a Program Administrator Agreement ("PA Agreement").  (SMF & RSMF ¶ 13;[5] ECF No. 164 at 2.)  The PA Agreement provides that All Risks could "not waive any condition

---

[4]  On a motion for summary judgment, the Court "draw[s] all reasonable inferences from the underlying facts in the light most favorable to the nonmoving party." *Jaffal v. Dir. Newark New Jersey Field Off. Immigr. & Customs Enf't*, 23 F.4th 275, 281 (3d Cir. 2022) (quoting *Bryan v. United States*, 913 F.3d 356, 361 n.10 (3d Cir. 2019)).

[5]  USI's Statement of Material Facts ("SMF") is at ECF No. 163-1; All Risks' Response to the Statement of Material Facts ("RSMF") is at ECF No. 168; All Risks' Supplemental Statement of Material Facts ("SSMF") is at ECF No. 168-1; USI's Response to the Supplement Statement of Material Facts ("RSSMF") is at ECF No. 169.

The Court summarizes the critical background facts here, and it explores specific facts related to the alleged misrepresentations in its discussion below.  Many of the responses from the parties were labeled as a denial yet either (a) evaded the statement, thereby admitting the factual content in the statement, or (b) claimed that cited records spoke for themselves, but did not dispute what the writings were alleged to say.  In such instances, the Court has reviewed the record and deemed factual statements admitted where appropriate. *See, e.g.*, *Read v. Profeta*, 397 F. Supp. 3d 597, 612 n.3 (D.N.J. 2019) (deeming facts admitted where party attempted to "qualify" response by "insert[ing] non-pertinent or nonresponsive material"); *Barker v. Our Lady of Mount Carmel Sch.*, Civ. No. 12-4308, 2016 WL 4571388, at *1 n.1 (D.N.J. Sept. 1, 2016) (deeming facts admitted where party did "not cite to any evidentiary support, add[ed] additional facts but d[id] not contest the asserted proposition, or assert[ed] arguments and legal analysis, not facts").

or make any change to . . . [Everest's] insurance policies, endorsements or applications without Mt. McKinley's prior written consent."  (SMF & RSMF ¶ 15; ECF No. 164 at 3.)

When All Risks priced and issued Everest insurance policies, All Risks was required to follow certain underwriting guidelines in the PA Agreement.  (SMF & RSMF ¶ 16; ECF No. 164 at 2-5.)  For example, when issuing a policy on behalf of Everest, All Risks was required to use designated policy forms.  (SMF & RSMF ¶ 20.)  These forms included the "Recording and Distribution of Material or Information in Violation of Law Endorsement," which the Court refers to as the "TCPA exclusion."  (SMF & RSMF ¶ 22.)  A policy that omits the TCPA exclusion *provides* insurance coverage for claims against an insured arising under the TCPA.  (SSMF ¶ 18.)

One of the Everest programs administered by All Risks under the PA Agreement was directed to alarm companies: the Security Guard Program.  (SMF & RSMF ¶ 17.)  The Security Guard Program underwriting guidelines required All Risks to obtain from proposed insureds loss runs showing five years of claims.  (SMF & RSMF ¶ 28.)  The guidelines also required All Risks to obtain a "brief description" for claims in the loss runs over $50,000.00.  (SMF & RSMF ¶ 29.)

USI had been Monitronics' insurance broker for several years, handling Monitronics' claims reporting.  (SSMF & RSSMF ¶¶ 6-7.)  Before August 2012, Monitronics was insured under a commercial general liability policy issued by First Mercury Insurance Company.  (SSMF & RSSMF ¶ 9.)  In March 2012, USI began to explore, on Monitronics' behalf, the market for other insurance coverage.  (SSMF & RSSMF ¶ 10.)  In June 2012, USI sent All Risks a written submission seeking a general liability policy for Monitronics.[6]  (SMF & RSMF ¶ 37; SSMF &

---

[6]      In 2004, All Risks and USI, through Summit Global, entered into a Broker Agreement to allow USI to solicit insurance coverage from Everest.  (SSMF & RSSMF ¶ 3.)  The Broker Agreement included a provision of good faith and fair dealing.  (SSMF & RSSMF ¶ 4.)

RSSMF ¶ 11.)  The submission included a loss run report identifying certain losses incurred by Monitronics in prior years.  (SMF & RSMF ¶¶ 30-34; SSMF & RSSMF ¶ 13.)

On August 20, 2012, James LaPlante, an All Risks Senior Underwriter, emailed USI a quote for a proposed commercial general liability policy from Everest.  (SMF & RSMF ¶ 41; SSMF & RSSMF ¶ 15.)  The initial quote was subject to certain terms and exclusions, including the TCPA exclusion that "disclaim[ed] coverage for any claims 'arising directly or indirectly out of any action or omission that violated or [was] alleged to violate'" the TCPA.  (SSMF & RSSMF ¶¶ 16-17 (citation omitted).)

Following discussion with USI, LaPlante issued a first revised quotation the next day, August 21, that deleted a racketeering endorsement from the proposed policy.  (SMF & RSMF ¶¶ 42-43.)  Following further discussion with USI, LaPlante sent an August 22 email to his supervisor Christopher McGovern (All Risks Senior Vice President and Program Director) noting that USI was concerned about the TCPA exclusion in the proposed policy for Monitronics, adding that

> [USI] claims Monitronics would not violate any laws – but they have no control over their dealers who would.  They Have a Cyber Liability policy so that would cover exclusion A – plus dealers hold them harmless which should take care of exclusion B.  Can we delete?  Don't want this to be a deal breaker.

> [(SMF & RSMF ¶¶ 44-45; SSMF & RSSMF ¶ 43.)]

McGovern responded: "As long as these exposures are covered elsewhere I do not see a problem deleting the form."  (SMF & RSMF ¶ 46; SSMF & RSSMF ¶ 44.)

Shortly after McGovern authorized the removal of the TCPA exclusion, LaPlante emailed USI a second revised quotation for a proposed policy that omitted the TCPA exclusion.  (SMF & RSMF ¶ 49; SSMF & RSSMF ¶¶ 45-46.)  After additional negotiations, Monitronics accepted the policy, and on August 31, 2012, All Risks issued on Everest's behalf a general liability policy to

Monitronics.  (SMF & RSMF ¶¶ 50-51; SSMF & RSSMF ¶ 47.)  The policy did not include the TCPA exclusion.  (SMF & RSMF ¶ 52.)

Once the insurance coverage was bound, USI reported on behalf of Monitronics numerous TCPA claims to Everest.  (SMF & RSMF ¶ 53; SSMF & RSSMF ¶ 49.)  Everest elected to defend and indemnify Monitronics against these TCPA claims, including several lawsuits that were consolidated by the Judicial Panel on Multidistrict Litigation in the United States District Court for the Northern District of West Virginia.  (SSMF & RSSMF ¶ 50.)

Everest later sued All Risks for the expense of indemnifying Monitronics against the TCPA claims.  (ECF No. 1.)  All Risks now sues USI to recover damages All Risks incurred because of Everest's claims.  (ECF No. 126 ¶¶ 66-67, 73, 81 ("Awarding All Risks all actual and consequential damages, including attorneys' fees, costs and expense, sustained by All Risks in connection with the Everest lawsuit.").)

## II.   **LEGAL STANDARD**

"Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure."  *In re Lemington Home for Aged*, 659 F.3d 282, 290 (3d Cir. 2011).  Pursuant to Rule 56, "[s]ummary judgment is proper when, viewing the evidence in the light most favorable to the nonmoving party and drawing all inferences in favor of that party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."  *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (citing Fed. R. Civ. P. 56(a)).  "A fact is material if—taken as true—it would affect the outcome of the case under governing law."  *M.S. by & through Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125 (3d Cir. 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "And a factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Id.* (quoting *Anderson*, 477 U.S. at 248).

## III.   DISCUSSION

### A. NEGLIGENT MISREPRESENTATION

In its prior decision, the Court determined that the balance of factors favor the application of Maryland law to the negligent misrepresentation claim, if a conflict of law exists between New Jersey and Maryland law.  (ECF No. 161 at 16-18.)  The Court reserved judgment pending additional briefing as to whether there is a conflict between the laws of the two states.  (*Id.*)  USI now argues that there is "no substantive distinction" between the laws of New Jersey and Maryland for negligent misrepresentation and that neither state recognizes a duty in tort between insurance intermediaries.   (ECF No. 163-2 at 13 (citing *Kearney v. Bayerische Motoren Werke Aktiengesellschaft*, Civ. No. 17-13544, 2018 WL 4144683, at *8 (D.N.J. Aug. 29, 2018)).)  All Risks argues that Maryland law should apply because Maryland law supports the existence of a duty between insurance intermediaries under these factual circumstances.  (ECF No. 166 at 31.)

Both Maryland and New Jersey require a plaintiff asserting a negligent misrepresentation claim to establish largely the same elements: (1) "the defendant, owing a duty of care to the plaintiff, negligently asserted a false statement;" (2) "the defendant intended that the plaintiff would act upon the statement;" (3) "the defendant knew that the plaintiff would probably rely on the statement and that the plaintiff would suffer loss or injury if the statement was erroneous;" (4) "the plaintiff, justifiably, took action in reliance on the statement;" and (5) "the plaintiff suffered damages proximately caused by the defendant's negligence."  *Bennett v. Ashcraft & Gerel, LLP*, 303 A.3d 1237, 1266 (Md. Ct. App. 2023) (citing *Balfour Beatty Infrastructure, Inc. v. Rummel Klepper & Kahl, LLP*, 155 A.3d 445, 461 n.18 (Md. Ct. App. 2017)); *accord Highlands Ins. Co. v. Hobbs Grp., LLC.*, 373 F.3d 347, 351 (3d Cir. 2004) ("In New Jersey (as in all other jurisdictions) any tort of negligence requires the plaintiff to prove that the putative tortfeasor breached a duty of care owed to plaintiff and that plaintiff suffered damages proximately caused

by that breach.  In particular, under New Jersey law negligent misrepresentation requires a showing that defendant negligently provided false information and that plaintiff incurred damages proximately caused by its reliance on that information."  (citations omitted)).

Neither party argues that the first element for negligent misrepresentation, a duty of care between two insurance intermediaries, can be established under New Jersey law.  (*See* ECF No. 163-2 at 26; ECF No. 166 at 31 ("All Risks submits that . . . the law of New Jersey . . . does not have law applicable to the duty and liability of insurance intermediaries.").)  Because neither party argues that New Jersey law establishes a duty here, the Court will examine whether such a duty is recognized under Maryland law.  If no duty exists under Maryland law, then the negligent misrepresentation claim necessarily fails.  *See, e.g.*, *Walpert, Smullian & Blumenthal, P.A. v. Katz*, 762 A.2d 582, 587 (Md. 2000) ("Absent a duty of care, there can be no liability in negligence."); *Hosmane v. Univ. of Maryland*, 2019 WL 4567575, at *6 (Md. Ct. Spec. App. Sept. 20, 2019) ("There was no duty, and the claims for negligent misrepresentation, constructive fraud, and negligence . . . fail.").

Having canvassed Maryland caselaw, the Court has not identified an instance where a court has recognized a duty in tort between insurance intermediaries when they are engaged in the sale/purchase of insurance policies for their principals, as in this case.[7]  At oral argument, counsel for both parties acknowledged that they had been unable to locate a case, in any jurisdiction, of a court recognizing a duty of care between insurance intermediaries.  Indeed, the Maryland cases cited by All Risks all address the duties that intermediaries owe to their principals (either to the

---

[7]     In 2001, Maryland's General Assembly "abolished" the distinction at law between insurance brokers and agents, referring to them both as "insurance producers."  *UBS Fin. Servs., Inc. v. Thompson*, 94 A.3d 176, 190 (Md. Ct. Spec. App. 2014).  This Court uses the terms "broker" and "agent" to distinguish between the two parties in this case.

insured or the insurance company) when obtaining or furnishing insurance.[8]  In *Sandler v. Loomis Company*, for example, the court explained that "[g]enerally, an insurance agent or broker owes a duty to 'exercise reasonable care and skill in performing his duties'" and that "[t]ypically, the tort duty of an agent or broker stems from a relationship of 'confidence and trust' that an insured has placed in an 'experienced and knowledgeable' insurance agent or broker." 776 A.2d 25, 37 (Md. Ct. Spec. App. 2001) (citations omitted).   And in *UBS Financial Services, Incorporated v. Thompson*, the court clarified that while insurance agents and brokers have duties to their principals "while obtaining the insurance," the duty does not usually extend after that point.  94 A.3d 176, 193 (Md. Ct. Spec. App. 2014) (collecting cases); *see also Cooper v. Berkshire Life Ins. Co.*, 810 A.2d 1045, 1069 (Md. Ct. Spec. App. 2002) ("insurance agents and brokers clearly owe a professional's duty to the insured").

All Risks argues that notwithstanding the lack of relevant authority, this Court should find a duty of care between insurance intermediaries under Maryland law, relying on either the "intimate nexus" test or section 552 of the Restatement (Second) of Torts.  (ECF No. 166 at 28-30 (citations omitted).)  Maryland's courts have carefully applied these two tests on a case-by-case basis, however, and they have refused to recognize duties between parties in a variety of contexts. *See, e.g.*, *Balfour Beatty Infrastructure, Inc. v. Rummel Klepper & Kahl, LLP*, 155 A.3d 445, 461-62 (Md. 2017) (holding that design professionals on government construction projects do not owe duty to contractors); *Blondell v. Littlepage*, 991 A.2d 80, 96 (Md. 2010) (holding that no duty existed between two attorneys engaged in joint representation); *Jones v. Hyatt Ins. Agency, Inc.*,

---

[8]     The secondary literature also discusses the duties of insurance intermediaries to their principals.  *See, e.g.*, 44 C.J.S. Insurance § 325 (May 2024) ("An agent or broker employed to effect insurance for another, like other agents, owes to the principal the duty to discharge with loyalty and good faith the trust imposed in him or her . . . .").

741 A.2d 1099, 1109 (Md. 1999) (holding that insurance agent did not owe duty to accident victim for failure to procure insurance).

Based on the absence of guiding authority, the Court is disinclined to hold here, for the first time, that a duty of care for negligent misrepresentation exists under Maryland law between insurance intermediaries who are obtaining or furnishing commercial insurance for their principals.  This federal court, sitting in diversity in New Jersey, is guided by the Third Circuit Court of Appeals' admonitions, which caution that "where 'two competing yet sensible interpretations' of state law exist, '[federal courts] should opt for the interpretation that restricts liability, rather than expands it, until . . . [the appropriate state court] decides differently.'" *Travelers Indem. Co. v. Dammann & Co.*, 594 F.3d 238, 253 (3d Cir. 2010) (quoting *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 680 (3d Cir. 2002)); *see also Leo v. Kerr-McGee Chem. Corp.*, 37 F.3d 96, 101 (3d Cir. 1994) ("[I]n a diversity case, however, federal courts may not engage in judicial activism.  Federalism concerns require that we permit state courts to decide whether and to what extent they will expand state common law. . . .  Our role is to apply the current law of the jurisdiction, and leave it undisturbed."  (quoting *City of Philadelphia v. Lead Indus. Ass'n, Inc.*, 994 F.2d 112, 123 (3d Cir. 1993))).

Without clear precedent indicating that Maryland's courts view the relationship between insurance intermediaries as being of the kind that gives rise to a duty for negligent misrepresentation, this Court does not find a compelling basis for it to expand Maryland's common law.  Accordingly, the Court will enter judgment in USI's favor on Count Five for negligent misrepresentation.

### B. Fraud in the Inducement

Under New Jersey law,[9] a fraud-in-the-inducement claim arises when damages result from "a misrepresentation of material fact; knowledge or belief by the speaker of its falsity; intent that the other party rely on the misrepresentation; and reasonable detrimental reliance by the other party." *1st Colonial Cmty. Bank v. Wolfson*, 2023 WL 4111383, at *5 (N.J. Super. Ct. App. Div. June 22, 2023) (citing *Nolan by Nolan v. Lee Ho*, 577 A.2d 143, 146 (N.J. 1990)); *accord Galen Publ'g, LLC v. ASiM Holdings, LLC*, 2024 WL 1949529, at *5 (N.J. Super. Ct. App. Div. May 3, 2024). In New Jersey, fraud "must be established by clear and convincing evidence." *Weil v. Express Container Corp.*, 824 A.2d 174, 182 (N.J. Super. Ct. App. Div. 2003).

After careful review of the parties' arguments and the present record, the Court finds sufficient genuine disputes of material fact to permit All Risks' fraud-in-the-inducement claim to proceed to trial. The Court will address each of USI's arguments in turn.[10]

#### 1. Economic Loss Doctrine

USI first argues that judgment should be entered in its favor because the fraud claim is barred by New Jersey's economic loss doctrine. (ECF No. 163-2 at 29-32.) The Court disagrees.

"New Jersey's economic loss doctrine precludes tort liability when the relationship between the parties is based solely on a contract." *Kemp v. Est. of Brandau*, 2022 WL 1179741, at *8 (N.J. Super. Ct. App. Div. Apr. 21, 2022). The doctrine "functions to eliminate recovery on a contract claim in tort claim clothing." *Id.* (quoting *G & F Graphic Servs., Inc. v. Graphic Innovators, Inc.*, 18 F. Supp. 3d 583, 588-89 (D.N.J. 2014)). While the economic loss doctrine

---

[9]     The Court previously determined that New Jersey law applies to the fraud-in-the-inducement claim, because New Jersey's elements are "identical" to the elements in Maryland, "and the parties offer[ed] no briefing to the contrary." (ECF No. 161 at 18-19.)

[10]    Because some of the arguments advanced with reference to the negligent misrepresentation claim also apply to the fraud-in-the inducement claim, the Court considers them here as well.

can bar certain tort claims, New Jersey's Appellate Division has explained that it "does not apply to fraud-in-the-inducement claims" because "a party fraudulently induced to enter a contract is not bound by that contract's terms, and, effectively, no contractual relationship exists." *Id.* This principle has been recognized by courts in this District as well. *See, e.g.*, *Warner v. Vision Solar LLC*, Civ. No. 22-5307, 2023 WL 4118348, at *5 (D.N.J. June 22, 2023) ("The economic loss doctrine does not preclude tort claims pertaining to fraudulent conduct when the very validity of the contract is at issue . . . ."). And "New Jersey federal and state decisions" have also "permitted a fraud claim to proceed . . . based on pre-contractual misrepresentations." *Bracco Diagnostics, Inc.*, 226 F. Supp. 2d at 563 (collecting cases). Here, the Court finds that Plaintiff's fraud-in-inducement claim based on USI's alleged misrepresentations during the parties' negotiations is not barred by the economic loss doctrine.

### 2. MATERIAL MISREPRESENTATIONS

USI next argues that its "representations were true and reflected what USI was told by Monitronics," and as a result, All Risks cannot establish fraud by clear-and-convincing evidence. (ECF No. 163-2 at 33.) Because a reasonable jury could find that USI's representations were false or materially misleading, judgment cannot be entered in USI's favor. *See In re Est. of Halpecka*, 2013 WL 3967141, at *2 (N.J. Super. Ct. App. Div. July 31, 2013) ("Fraud includes truthful representations that the maker knows or believes are 'materially misleading' without 'additional or qualifying' information." (quoting Restatement (Second) of Torts § 529 (1977))).

All Risks focuses on four alleged statements made by USI's representatives during the negotiations in August 2012.[11] *First*, USI represented that Monitronics' prior general liability

---

[11] USI criticizes All Risks for relying on different allegations at summary judgment than were pleaded in its Second Amended Third-Party Complaint. (ECF No. 163-2 at 14-15.) The Court does not see any major departure between the pleaded allegations and the evidence and arguments on summary judgment. (*See generally* ECF No. 126.) The misrepresentations alleged in the

insurance policy did not include a TCPA exclusion, without disclosing to All Risks if the prior insurer was willing to renew the policy on the same terms. (ECF No. 167-2 at 12.) *Second*, USI represented that "Monitronics did not engage directly in any telemarketing activities," without disclosing the extent to which Monitronics' third-party vendors engaged in telemarketing. (*Id.* at 63.) *Third*, USI represented that "there were indemnity contracts between Monitronics" and third-party "vendors that were favorable to Monitronics in providing hold harmless provisions," without disclosing that those hold harmless provisions were unlikely to provide a real shield against TCPA suits. (*Id.* at 64.) And *fourth*, USI represented that Monitronics had a cyber liability insurance policy that was a "first line of defense" against any TCPA claims, without disclosing that Monitronics was set to obtain a new cyber insurance policy that did not protect against TCPA claims.[12] (*Id.* at 57-58.)

All Risks argues that USI's representations were either false or materially misleading because they "downplayed the risk of TCPA claims against Monitronics" and were "designed to leave the misleading impression that Everest did not need the [TCPA exclusion] to protect its interests." (ECF No. 166 at 13.) All Risks emphasizes that its Senior Underwriter LaPlante testified that he had been "deceived" and that USI knew that the information being shared was "materially incomplete, and therefore misleading." (*Id.* at 14.)

---

complaint are nearly identical to what is now at issue. (*Id.* ¶¶ 27-39, 62-73, 78-81.) Therefore, there is no basis to preclude All Risks from presenting its claims. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 546 (2007) ("[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint.").

[12]   All Risks also argues that "USI . . . failed to obtain a signed warranty statement from Monitronics in August 2012 prior to the binding of coverage," but it does not assert this failure as one of the bases for its claims. (ECF No. 166 at 22-23.) All Risks only notes that "this information [could be] relevant to USI's credibility generally." (*Id.*)

In response, USI argues that "the supposed falsities . . . were in fact true." (ECF No. 163-2 at 21.) USI writes that "All Risks asked USI certain questions about Monitronics' business. USI answered them honestly. If All Risks did not ask the right questions or if it did not reach the right conclusion, the liability falls on it and not USI." (*Id.* at 16.) USI also argues that any statements it made about what coverage would be in the future was a forward-looking prediction that "is not a basis for an actionable misrepresentation claim." (*Id.* at 20.)

To what extent USI may have made material misstatements of fact presents a question to be determined by the trier of fact in this case. Each party has a competing narrative as to what information was shared, how it was portrayed, and whether it was done with deceptive intent. Considering the testimony and deciding how much credibility to assign it is not the role of this Court under the present circumstances. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he [or she] is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."); *CareOne at Birchwood, LLC v. Twp. of Edison*, Civ. No. 22-7976, 2024 WL 1298902, at *7 (D.N.J. Mar. 27, 2024) ("[I]n deciding a party's summary judgment motion, the Court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.").

For example, although All Risks acknowledges that Monitronics had an "Axis" cyber liability insurance policy with $10 million in applicable coverage, it emphasizes that USI's representation about this policy serving as the "first line of defense" ignored that the policy was ending and that Monitronics intended to obtain a new cyber liability insurance from "Beazley," which would no longer cover TCPA claims. (SSMF ¶¶ 34-36.) All Risks also emphasizes that while USI shared that Monitronics had agreements with third-party vendors that contained hold

harmless provisions, USI did not share that the vendors did not have the TCPA exclusion "deleted" from their own policies, which meant that Monitronics was "exposed from dollar one to those vendors." (SSMF ¶ 33.) All Risks also underscores that USI was not forthcoming in sharing that the insurance policies issued by First Mercury to Monitronics before 2012 did not include a TCPA exclusion nor did USI highlight that Monitronics was already subject to class action litigation asserting TCPA claims in federal court in West Virginia. (SSMF ¶¶ 25, 28-29.)

Viewed in the light most favorable to All Risks, as the non-moving party, a reasonable jury could find that USI's representations were inaccurate or materially misleading. The representations do not concern solely a future fact, as argued by USI. A reasonable juror could conclude, for example, that USI knew in August 2012 that Monitronics would soon switch to a new cyber liability policy that did not provide TCPA coverage.

### 3. REASONABLE RELIANCE/PROXIMATE CAUSE

Finally, USI argues that the fraud claim should fail for two related reasons: (1) unjustifiable reliance and (2) superseding cause. (ECF No. 163-2 at 21-26, 32-33.)

On the first issue, USI contends that All Risks could not have reasonably relied on any alleged misrepresentations when the PA Agreement "required All Risks to consult with Everest and obtain Everest's written authority to remove . . . any mandatory form." (ECF No. 163-2 at 23-24.) Because "All Risks ignored and breached the terms of its PA Agreement with Everest," USI submits that any reliance by All Risks on USI's alleged misrepresentations is unreasonable. (*Id.* at 23.) USI also submits that All Risks' reliance was unjustified because All Risks did not adequately review the loss run report that USI provided. (*Id.* at 25-26.)

On the second issue, USI contends that it should be relieved of liability because if All Risks had performed proper underwriting and not exceeded its authority under the PA Agreement, then All Risks would not have unilaterally removed the TCPA exclusion and Everest would not have

sued All Risks. (*Id.* at 32-33.)  In other words, USI contends that All Risks' own negligence and breach of its contract with Everest is the proximate cause of All Risks' damages, not USI's alleged misrepresentations.

Courts have long recognized that whether a party reasonably relied on another's representations presents a dispute of fact that should ordinarily be resolved by the factfinder at trial, not the judge on summary judgment. *See, e.g.*, *Angrisani v. Cap. Access Network, Inc.*, 175 F. App'x 554, 557 (3d Cir. 2006) ("the question of whether . . . reliance was reasonable presents a factual issue that is more properly left to the judgment of the jury"); *Labus v. Navistar Int'l Transp. Corp.*, 740 F. Supp. 1053, 1063 (D.N.J. 1990) ("The legitimacy of the representations and the reasonableness of the employee's reliance are questions for the finder of fact that are not appropriate for summary judgment."); *Vogel v. Est. of Hillman*, 2021 WL 2451303, at *17 (Md. Ct. Spec. App. June 16, 2021) ("the reasonableness of his reliance is a question for the jury"); *see also Tran v. Metro. Life Ins. Co.*, 408 F.3d 130, 141 (3d Cir. 2005) ("This case, like most others raising the issue of justifiable reliance, presents disputed issues of material fact that are simply more appropriate for resolution by a jury than by a judge."); *Carroll Co. v. Sherwin-Williams Co.*, Civ. No. 11-1700, 2013 WL 1352285, at *7 (D. Md. Apr. 2, 2013) ("Sherwin-Williams argues that Plaintiffs cannot establish that it made the alleged misrepresentations for the purpose of defrauding Plaintiffs and, even if it could, Plaintiffs' reliance on its representations was not reasonable.  Both of these issues are most appropriately resolved by a jury.").

Similarly, New Jersey's courts have long recognized that the issue of proximate causation, and whether a later act or omission supersedes the original tortfeasor's conduct, is an issue ordinarily presented to a jury as well. *See, e.g.*, *Ocampo v. FAMCO, LLC*, 2010 WL 3932797, at *4-5 (N.J. Super. Ct. App. Div. Oct. 5, 2010) (explaining that "ordinarily, 'causation' is a factual question reserved for the jury" and that "[c]ourts have rejected liability as a matter of law in unique

cases of 'highly extraordinary consequences'" (collecting cases)); *Taylor v. Fontenot*, Civ. No. 05-1911, 2007 WL 9782881, at *3 (D.N.J. Aug. 8, 2007) ("questions of proximate cause and intervening cause are ordinarily determined by the fact finder"); *see also Winschel v. Brown*, 171 P.3d 142, 149 (Alaska 2007) (concluding that "the issue of proximate cause should have been left to the jury" and reversing the lower court's finding on summary judgment that the plaintiff's "own conduct . . . was an unforeseeable, superseding cause that broke the chain of causation and relieved [the defendant] of any liability"); *Goldberg v. Fla. Power & Light Co.*, 899 So. 2d 1105, 1117-18 (Fla. 2005) ("[J]uries in similar contexts have rightly determined that a plaintiff's negligence . . . does not necessarily constitute an intervening and superseding cause relieving the initially negligent party . . . of liability.").

Although USI has presented legitimate arguments as to reasonable reliance and proximate causation, the Court finds that the issues are properly put to a factfinder at trial, and it would be imprudent to enter judgment at this time on these bases. This is not a "highly extraordinary" case that warrants deciding the issues as a matter of law. A jury should hear the testimony and review the evidence and determine if this is a circumstance where All Risks' own actions (not abiding by the PA Agreement) renders All Risks' alleged reliance on USI's misrepresentations unreasonable or serves as a directly intervening cause that relieves USI of liability.

### C. COMMON-LAW INDEMNITY

Under Maryland law,[13] a common-law right to indemnity may "arise by implication, either of fact or by law." *Pulte Home Corp. v. Parex, Inc.*, 942 A.2d 722, 730 (Md. Ct. App. 2008). Implied indemnity "in fact may arise from a special relationship between the parties, usually contractual in nature, or from a course of conduct." *Id.* Indemnity in law is equitable and "may

---

[13]     The Court previously determined that Maryland law applies to the common-law indemnity claim. (ECF No. 161 at 19.)

exist between persons liable for a tort." *Id.* at 730-31. The basis for such indemnity between tortfeasors is "the concept that one person is unjustly enriched at the expense of another when the other discharges liability that it should be his responsibility to pay." *Franklin v. Morrison*, 711 A.2d 177, 182 (Md. Ct. App. 1998) (quoting Restatement (Second) of Torts § 886B cmt. c (1979) (Restatement)).

Where, as here, indemnity in law is asserted based on an alleged tort, Maryland courts recognize a "distinction between active and passive negligence." *Max's of Camden Yards v. A.C. Beverage*, 913 A.2d 654, 660 (Md. Ct. Spec. App. 2006). In other words, the right to "indemnity exists when there is a disparity between the levels of fault of each tortfeasor that produces an unjust result, and the less culpable tortfeasor, said to be passively or secondarily negligent, pays or is held liable for damages which are properly attributable to the conduct of the more culpable co-defendant, who is primarily or actively negligent." *Id.*

It is well settled that "'one who is guilty of active negligence cannot obtain tort indemnification,' regardless of whether the alleged tortfeasor from whom indemnity is being sought was actively negligent." *Id.* (quoting *Franklin*, 711 A.2d at 187); *see also Pulte Home Corp.*, 942 A.2d at 731 ("The principal holding in *Franklin* was a reconfirmation of the long-established view in Maryland that 'one who is guilty of active negligence cannot obtain tort indemnification.'" (quoting *Franklin*, 711 A.2d at 187)); 12 M.L.E. Indemnity § 10 (Feb. 2024) ("Simply stated, one who is guilty of active negligence cannot obtain tort indemnification, regardless of whether the alleged tortfeasor from whom indemnity is being sought was actively negligent.").

In Maryland, "[t]he determination of whether a tortfeasor's negligence is active or passive" is often "made by referring to the plaintiff's complaint against the defendant seeking to implead

the third party."[14] *Holman v. Greyhound Lines, Inc.*, Civ. No. 21-112, 2022 WL 1720152, at *9 (D. Md. May 27, 2022) (quoting *Pyramid Condo. Ass'n v. Morgan*, 606 F. Supp. 592, 596 (D. Md. 1985)). "If the plaintiff's complaint alleges conduct by the third-party plaintiff that would constitute active negligence, or if it is clear from the circumstances revealed by the plaintiff's complaint that the defendant's (third-party plaintiff) liability would only arise, if at all, from proof of active negligence, there is no basis for an indemnity claim and dismissal of the claim is appropriate." *Id.* (quoting *Pyramid Condo. Ass'n*, 606 F. Supp. at 596); *see also KeraLink Int'l, Inc. v. Stradis Healthcare, LLC*, Civ. No. 18-2013, 2021 WL 4420636, at *16 (D. Md. Sept. 27, 2021) ("Whether a tortfeasor's negligence is active or passive is determined by referring to the plaintiff's complaint against the defendant seeking to implead the third party."); *Max's of Camden Yards*, 913 A.2d at 662 ("There is support for the proposition that the nature of each party's negligence, active versus passive, is determined based on the pleadings by the tort plaintiff."); *see also Bd. of Trustees of Baltimore Cnty. Cmty. Colleges v. RTKL Assocs., Inc.*, 559 A.2d 805, 811 (Md. Ct. Spec. App. 1989) ("If the complaint alleges conduct that constitutes active negligence on the part of the party seeking indemnification, or if it is clear from circumstances revealed in the complaint that liability would only arise from proof of active negligence, there is no basis for an indemnity claim.").

"[T]he distinction between active and passive negligence turns on whether the third-party plaintiff was negligent or whether its liability is entirely dependent on the negligence of another

---

[14] Even so, some Maryland courts have "left open the question of whether – or when – the availability of indemnity turns only on allegations in the complaint, or includes facts found after a hearing involving the plaintiff and the tortfeasor seeking indemnity." *Potomac Elec. Power Co. v. Midwest Mole, Inc.*, Civ. No. 19-03037, 2022 WL 17362679, at *5 (D. Md. Dec. 1, 2022) (quoting *Nat'l Lab. Coll., Inc. v. Hillier Grp. Architecture New Jersey, Inc.*, Civ. No. 09-1954, 2012 WL 3264959, at *8 (D. Md. Aug. 9, 2012)); *see also Johnson v. City of Annapolis*, Civ. No. 21-1074, 2023 WL 3390823, at *8 (D. Md. May 11, 2023) (noting that the active-passive analysis may be "fact-intensive" and not appropriately decided "on a motion to dismiss").

defendant." *Potomac Elec. Power Co.*, 2022 WL 17362679, at *6 (collecting cases).  For example, a "right to indemnity may arise where one party is vicariously liable for the conduct of another person but did not participate in any way in the actions giving rise to the tort." *Pyramid Condo. Ass'n*, 606 F. Supp. at 596; s*ee also* 65 C.J.S. Negligence § 13 (Aug. 2023) ("The term 'active negligence,' as properly used, denotes some positive act or some failure in a duty of operation which is the equivalent of a positive act . . . ."); *Sweeny v. Pease*, 294 N.W.2d 819, 823 (Iowa 1980) ("Active negligence . . . exists when the person seeking indemnity has personally participated in an affirmative act of negligence, was connected with a negligent act or omission by knowledge or acquiescence, or has failed to perform a precise duty in breach of an agreement.").

Here, All Risks argues that USI must indemnify All Risks for "liability to Everest . . . , including [All Risks'] settlement payment plus all costs."  (ECF No. 126 ¶¶ 78-81.)  However, Everest's original Complaint against All Risks, All Risks' Second Amended Third-Party Complaint against USI, and the record evidence all support the conclusion that All Risks' liability to Everest is tied to proof of All Risks' "active" negligence: All Risks' decision to remove the mandatory TCPA exclusion from the Everest insurance policy issued to Monitronics without first obtaining written permission in accordance with the PA Agreement.

In Everest's original Complaint, Everest alleged that All Risks was obligated to include the TCPA exclusion "in Everest insurance policies pursuant to All Risks' limited underwriting authority granted under a Program Administrator Agreement" but All Risks "unilaterally agreed to remove the mandatory TCPA [exclusion] from the policies it quoted to Monitronics."  (ECF No. 1 ¶¶ 2, 23-26.)  Everest claimed that due to All Risks' breaches of its duties under the common law and the PA Agreement, Everest had suffered damages and expenses.  (*Id.* ¶¶ 33-55.)

Similarly, in All Risks' Second Amended Third-Party Complaint against USI, All Risks alleged that its liability to Everest arose from All Risks' removal of the TCPA exclusion from the

Everest insurance policy without authorization under the PA Agreement.  (*See* ECF No. 126 ¶¶ 37-38 ("The Complaint in the Everest Lawsuit alleged that Everest was unnecessarily forced to assume Monitronics' defense and indemnification, as well as defend itself against the Monitronics DJ Action, as a result of All Risks' improper removal of the RDM exclusion . . . .  All Risks paid Everest a significant sum to settle the Everest Lawsuit.").).

Finally, All Risks' Rule 30(b)(6) designee, Christopher McGovern (All Risks Senior Vice President and Program Director), testified during his deposition that Everest's claims arose from All Risks not having authority under the PA Agreement to delete the TCPA exclusion without written permission.  (ECF No. 164-6 at 21-22 ("Q. And that was based on their allegations that you had no authority to issue that endorsement, correct?  A. That's my understanding.  Q. That was the essence of the case, right?  A. I believe so.").)  And the PA Agreement states that All Risks' authority as an underwriter for Everest was restricted, and All Risks was not permitted to "waive any condition or make any change to . . . [Everest's] insurance policies, endorsements or applications without . . . prior written consent."  (ECF No. 164 at 2-3.)

All Risks' alleged negligence—All Risks' breach of its contractual obligations under the PA Agreement by removing the TCPA exclusion from Everest's insurance policy without written authorization—is a positive act that fits within the framework of "active negligence."  *See, e.g.*, *Compton v. Hankin*, Civ. No. 07-2311, 2008 WL 11363300, at *8 (D. Md. Apr. 10, 2008) (dismissing third-party plaintiff's common-law indemnity claim where the allegations were that he "committed acts that constitute active negligence," such as making errors on applications, failing to advise of regulatory requirements, and failing to timely distribute proceeds); *Richards v. Freeman*, 179 F. Supp. 2d 556, 560 (D. Md. 2002) (finding active negligence where defendants were alleged to have "failed to operate their motor vehicles in a careful, cautious and lawful manner"); *see also Dastranj v. Dehghan*, Civ. No. 15-2436, 2016 WL 7012299, at *4 (D. Md.

Dec. 1, 2016) (noting that a party not entitled to indemnity where its fails "to perform some legal duty"); *Pyramid Condo. Ass'n*, 606 F. Supp. at 596 ("[I]f it is clear from the circumstances . . . that the defendant's (third-party plaintiff) liability would only arise, if at all, from proof of active negligence, there is no basis for an indemnity claim and dismissal of the claim is appropriate.").

In opposition to summary judgment, All Risks does not meaningfully explain why its alleged negligence should not be deemed "active." (ECF No. 166 at 37-39.) Instead, All Risks focuses on the reasons why USI should be deemed "actively negligent." (*Id.* at 39.) Nevertheless, that USI's misrepresentations may constitute "active" negligence is insufficient to permit All Risks to maintain a common-law indemnity claim under Maryland law where All Risks engaged in "active" negligence as well. *See Max's of Camden Yards*, 913 A.2d at 660 ("'[I]t is well established under Maryland law that one who is guilty of active negligence cannot obtain tort indemnification,' regardless of whether the alleged tortfeasor from whom indemnity is being sought was actively negligent." (quoting *Franklin*, 711 A.2d at 177)); *see also Hejazi v. Oliveri & Assocs., LLC*, Civ. No. 14-02974, 2015 WL 6750793, at *3 (D. Md. Nov. 5, 2015) ("[A] judgment against Oliveri would necessarily require a factual finding that Oliveri was 'actively' negligent, and it would not be entitled to indemnification from a third-party even if that party also engaged in wrongful conduct. Accordingly, Oliveri's indemnification claim must be dismissed."). Accordingly, judgment will be entered against All Risks on its common-law indemnity claim in Count Seven.[15]

---

[15]     The Court's "active" negligence determination is limited to the common-law indemnity claim under Maryland law. All Risks' fraud claim will be decided by a jury for the reasons set forth above.

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, and other good cause shown, USI's Second Motion for Summary Judgment (ECF No. 163) is **GRANTED** in part and **DENIED** in part.  An appropriate Order follows.

Dated:  July 18, 2024

**GEORGETTE CASTNER**
**UNITED STATES DISTRICT JUDGE**
